**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

BRADLEY GRAY,                          )
                                       )
        Plaintiff(s),                  )
                                       )
        vs.                            )        Case No. 4:20 CV 1077 SRW
                                       )
ANDREW M. SAUL,[1]                     )
Commissioner of Social Security        )
Administration,                        )
                                       )
        Defendant(s).                  )

**MEMORANDUM AND ORDER**

This matter is before the Court on review of an adverse ruling by the Social Security

Administration. The Court has jurisdiction over the subject matter of this action under 42 U.S.C.

§ 405(g). The parties consent to the exercise of authority by the United States Magistrate Judge

pursuant to 28 U.S.C. § 636(c). Plaintiff filed a Brief in Support of the Complaint. ECF No. 25.

Defendant filed a Brief in Support of the Answer. ECF No. 30. Plaintiff did not file a Reply. The

Court has reviewed the parties' briefs and the entire administrative record, including the

transcripts and medical evidence. Based on the following, the Court will affirm the

Commissioner's decision.

I.      **Factual and Procedural Background**

        On June 23, 2015 and June 25, 2015, Plaintiff Bradley Gray protectively filed an

application for disability insurance benefits (DIB) under Title II, 42 U.S.C. §§ 401, *et seq*. and an

---

[1] At the time this case was filed, Andrew M. Saul was the Commissioner of Social Security. Kilolo Kijakazi became the Commissioner of Social Security on July 9, 2021. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name, and the Court may order substitution at any time. *Id.* The Court will order the Clerk of Court to substitute Kilolo Kijakazi for Andrew M. Saul in this matter.

1

application for supplemental security income (SSI) under Title XVI, 42 U.S.C. §§ 1381, *et seq*.
Tr. 239-49. Plaintiff's application was denied on initial consideration, and he requested a hearing
before an Administrative Law Judge ("ALJ"). Tr. 126-37.

On October 2, 2017, the ALJ issued an Order of Dismissal due to Plaintiff's failure to
appear at his September 22, 2017 hearing. Tr. 118-22, 170. Plaintiff filed a request for review of
the ALJ's dismissal with the Appeals Council. Tr. 171-72. On March 9, 2018, the Appeals
Council found that Plaintiff showed good cause for his failure to appear, and remanded the case
for Plaintiff to have another opportunity at a hearing. Tr. 123-25.

Plaintiff appeared for the scheduled hearing on August 7, 2018. Tr. 57-64. Plaintiff
requested additional time to obtain counsel, and the hearing was postponed. On June 18, 2019,
Plaintiff and counsel appeared for the rescheduled hearing. Tr. 66-93. Plaintiff testified
concerning his disability, daily activities, functional limitations, and past work. *Id*. The ALJ also
received testimony from vocational expert Amelia Shelton. *Id*. On October 4, 2019, the ALJ
issued an unfavorable decision finding Plaintiff not disabled. Tr. 8-27. Plaintiff filed a request for
review of the ALJ's decision with the Appeals Council. Tr. 6-7, 236-38. On June 17, 2020, the
Appeals Council denied Plaintiff's request for review. Tr. 1-4. Accordingly, the ALJ's decision
stands as the Commissioner's final decision.

With regard to Plaintiff's testimony, medical records, and work history, the Court
accepts the facts as presented in the parties' respective statements of facts and responses. The
Court will discuss specific facts relevant to the parties' arguments as needed in the discussion
below.

## II.     Legal Standard

A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" § 1382c(a)(3)(B).

The Commissioner follows a five-step sequential process when evaluating whether the claimant has a disability. 20 C.F.R. § 416.920(a)(1). First, the Commissioner considers the claimant's work activity. If the claimant is engaged in substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see whether the claimant has a severe impairment "which significantly limits claimant's physical or mental ability to do basic work activities." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010); *see also* 20 C.F.R. § 416.920(a)(4)(ii). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 20 C.F.R. §§ 416.920(c), 416.920a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity. If the impairment meets or equals one of the presumptively

disabling impairments listed in the regulations, the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(5)(i). An RFC is "defined as the most a claimant can still do despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011); *see also* 20 C.F.R. § 416.945(a)(1). While an RFC must be based "on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016).

Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Ultimately, the claimant is responsible for *providing* evidence relating to his RFC, and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work which exists in significant numbers in the national economy shifts to the Commissioner. *See Brock v. Astrue*,

4

574 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work which exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled. 20 C.F.R. § 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. *Id.* At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant. *Hensley*, 829 F.3d at 932.

If substantial evidence on the record as a whole supports the Commissioner's decision, the Court must affirm the decision. 42 U.S.C. §§ 405(g); 1383(c)(3). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* Under this test, the court "consider[s] all evidence in the record, whether it supports or detracts from the ALJ's decision." *Reece v. Colvin*, 834 F.3d 904, 908 (8th Cir. 2016). The Court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Id.* The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016).

## III.    The ALJ's Decision

Applying the foregoing five-step analysis, the ALJ found Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2014, and has not engaged in substantial gainful activity since January 15, 2013, the alleged onset date. Tr. 13. Plaintiff has the severe impairment of "right-sided acoustic neuroma, status post external beam radiation, with

right-sided hearing loss." Tr. 13-14. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. Tr. 14. The ALJ found Plaintiff has the following RFC through the date last insured:

> [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to work that does not require bilateral hearing as an essential component more than occasionally (such as work which would require using headset, dispatcher, etc.). The [Plaintiff] should not climb ladders, ropes or scaffolds and no work at unprotected heights, around moving mechanical parts or other such hazards.

Tr. 14-18. The ALJ found Plaintiff was capable of performing past relevant work as a delivery driver (*Dictionary of Occupational Titles* ("*DOT*") No. 739.687-066) because such work did not require the performance of work-related activities precluded by this RFC. 18-19.

The ALJ also found there were other jobs existing in the national economy Plaintiff could perform. *Id.* In making this alternative determination, the ALJ noted Plaintiff was born on August 29, 1970, and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Plaintiff has at least a high school education and is able to communicate in English. The ALJ determined the transferability of job skills was not material to the determination of disability because, using the Medical-Vocational Rules as a framework, it supported a finding that Plaintiff was "not disabled," whether or not he had transferable job skills. *Id.* Relying on the testimony of the VE and considering Plaintiff's age, education, work experience and RFC, the ALJ found jobs existed in significant numbers in the national economy which the Plaintiff could perform, including representative occupations such as cleaner (*Dictionary of Occupational Titles* ("*DOT*") No. 381.687-018); hand packer (*DOT* No. 559.687-016); linen room attendant (*DOT* No. 222.387-030); and laundry worker (*DOT* No. 361.684-

014). Tr. 19. The ALJ then concluded Plaintiff was not under a disability from January 15, 2013, through the date of this decision on October 4, 2019. Tr. 19-20.

IV.    **Discussion**

Plaintiff challenges the decision on three grounds: (1) the ALJ incorrectly determined Plaintiff's headaches to be non-severe at Step Two; (2) the ALJ did not properly evaluate his subjective complaints; and (3) the ALJ failed to properly evaluate the RFC opinion of his treating oncologist, Dr. Vincent Joe.

**A. Step Two Determination**

Plaintiff argues the ALJ erred in finding his headaches to be a non-severe impairment. At Step Two of the evaluation process, an ALJ must determine if a claimant suffers from a severe impairment. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). The claimant bears the burden of proving his impairment or combination of impairments is severe, but the burden is not a heavy one, and any doubt concerning whether the showing has been made must be resolved in favor of the claimant. *Id.*; *Dewald v. Astrue*, 590 F. Supp. 2d 1184, 1200 (D.S.D. 2008). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard[.]" *Kirby*, 500 F.3d at 708.

A severe impairment is an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to perform basic work activities. *See* 20 C.F.R. §§ 416.920(c), 416.921. An impairment is not severe if it amounts to only a slight abnormality and does not significantly limit the claimant's physical or mental ability to do basic work activities. *Kirby*, 500 F.3d at 707; 20 C.F.R. § 416.921(a). Basic work activities concern the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 416.921(b). Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing,

7

pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3)

understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5)

responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing

with changes in a routine work setting. *Id.* The sequential evaluation process terminates at Step

Two if the impairment has no more than a minimal effect on the claimant's ability to work.

*Kirby*, 500 F.3d at 707; *Hudson v. Bowen*, 870 F.2d 1392, 1396 (8th Cir. 1989).

Here, the ALJ determined Plaintiff's tension headaches to be a non-severe impairment

"because it constituted no more than a slight abnormality with no more than a minimal effect on

the [Plaintiff's] ability to perform basic work activities for a continuous period of 12 months."

Tr. 14. In making this determination, the ALJ acknowledged Plaintiff's testimony that he had

headaches three to five times per week and daily nosebleeds. Tr. 14, 80-82. The ALJ, however,

found Plaintiff's subjective reports regarding the severity of his headaches to be unsupported by

the medical record.

As to Plaintiff's testimony regarding nosebleeds, the ALJ considered the fact that he

never reported any such symptom to his treating medical providers. Tr. 14. In fact, the only

mention of nosebleeds in the record is Plaintiff's own report of this alleged symptom to State

agency consultative examiner, Dr. John Irlam, D.O., during his January 31, 2019 RFC

examination. Tr. 14, 532.

As to Plaintiff's testimony regarding headaches, the ALJ cited to Missouri Baptist

Medical Center treatment notes from March 18, 2013. Tr. 14, 476. Plaintiff's oncologist, Dr. Joe,

indicated he complained "of some vague headaches." Tr. 14, 476. On September 12, 2013,

Plaintiff "denie[d] any significant headaches or nausea." Tr. 483. On March 12, 2015, Plaintiff

reported only "some occasional headaches." Tr. 14, 487. Plaintiff did not return to his oncologist

8

until March 10, 2016, at which time Plaintiff reported "worsening headaches" which were sometimes "so severe, he [would be] incapacitated for 2-3 days." Tr. 14, 494. Dr. Joe recommended the following treatment plan:

> I would recommend Mr. Gray return for follow up again in 1 year. I would repeat an MRI again at that point. Certainly, if he has any worsening symptoms, he can be seen sooner if necessary. In the meantime, we will consider having him evaluated by a neurologist for his headaches as they do appear to be increasing in severity and frequency.

Tr. 494. Plaintiff did not seek additional treatment until more than a year later. Tr. 14, 540-42.

On September 18, 2017, Plaintiff appeared to neurologist, Dr. Glenn Lopate, in which he reported headaches occurring two to three times per week, but denied photophobia, nausea, or double vision. *Id.* Dr. Lopate opined his headaches were "likely tension type," which were "further complicated by [over-the-counter] medication overuse." Tr. 542. Dr. Lopate directed Plaintiff to take "[l]ess than 5 pills weekly of Tylenol or ibuprofen" and to hydrate. *Id.* Plaintiff was also provided with a prescription for Nortriptyline and explicitly instructed to call the clinic in one week to report whether the medication reduced his symptoms. *Id.* He was further directed to return to the clinic in six months for a follow up appointment. *Id.* Plaintiff did not comply with any of Dr. Lopate's directives.

Two years later, on January 15, 2019, Plaintiff made an appointment with Dr. Joe. Tr. 14, 641. Dr. Joe noted the following in his progress report: "[Plaintiff] unfortunately was lost to follow-up throughout 2018. He returns now for headache evaluation. He reports he lost insurance last year but has gotten (Medicaid)." *Id.* Dr. Joe indicated a patient "does not need insurance to be seen in a clinic." *Id.* During this visit, Plaintiff reported that the Nortriptyline prescription helped his symptoms with no side effects, but he unilaterally decided not to request a refill until he followed up with the clinic. *Id.* Plaintiff also reported he was still taking up to a bottle of

Tylenol per week without much relief. Tr. 641-642. Once again, Plaintiff was advised his headaches were "further complicated by medication overuse." Tr. 648. Plaintiff was put back on his Nortriptyline prescription and told to follow up in six months. Tr. 649. On May 24, 2019, Plaintiff reported "occasional headaches" and was directed to follow up in one year, unless he had a worsening of symptoms. Tr. 605-06.

After considering the medical evidence, the ALJ considered Plaintiff's reports and testimony of being able to prepare simple meals, do basic household chores, shop, and manage his own finances. Tr. 15. The ALJ found these activities to be inconsistent with Plaintiff's allegations of disabling pain. *See Gwanthey v. Chater*, 104 F.3d 1043, 1045 (8th Cir.1997) (holding that plaintiff's ability to perform housework among other activities precluded a finding of disability). Additionally, the ALJ found that the significant gaps in his treatment were inconsistent with his testimony regarding severity.

Plaintiff argues the ALJ should have found his headaches to be a severe impairment because, although "the ALJ is correct in reciting the dates that the [P]laintiff attended appointments, [the ALJ] fails to recognize that at almost all visits throughout the relevant time frame [P]laintiff did complain of headaches, even if few and far between." ECF No. 25, at 4. The Plaintiff also points to his own Function Report in which he alleged severe headaches affected his concentration and prevented him from working. *Id.* at 5 (citing Tr. 313).

The Court cannot agree with Plaintiff's argument because the ALJ's conclusion of non-severity is supported by substantial evidence. The ALJ pointed to significant gaps in his treatment which were inconsistent with debilitating symptoms. *See Siemers v. Shalala,* 47 F.3d 299, 302 (8th Cir. 1995) (gaps in treatment can undermine a plaintiff's credibility). For example, in March of 2016, Plaintiff began to complain of an onset of worsening headaches. Tr. 494.

Plaintiff did not, however, follow up with his treating provider regarding these complaints until more than a year later in September of 2017. During that visit he was prescribed medication to alleviate his headache symptoms and explicitly directed to contact the clinic in one week to report the efficacy of the treatment. He was also instructed to schedule an in-person appointment six months later. Plaintiff did neither and allowed his prescription to lapse. Tr. 540-42.

Not until January 15, 2019, did Plaintiff appear for an appointment with his oncologist. Tr. 14, 641. Although Plaintiff explained this gap in treatment was due to a change in insurance, the progress notes state he had transitioned to Medicaid. Tr. 641. He did not need insurance to be seen in the clinic. *Id.* Thus, not only was it appropriate for the ALJ to consider the significant gaps in his headache treatment, an ALJ may also weigh a plaintiff's failure to comply with a relatively conservative course of treatment as a negative factor in assessing the plaintiff's self-reported symptoms. *Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015).

Plaintiff's non-compliance with treatment directives further reduced his credibility as to the severity of his headaches. *See Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006) (ALJ may properly consider noncompliance in determining plaintiff's credibility). During Plaintiff's irregular visits with his treating providers, he was told to significantly reduce the amount of over-the-counter medication he was taking because it was complicating his treatment. Specifically, on September 18, 2017, Plaintiff's neurologist told him to take "[l]ess than 5 pills weekly of Tylenol or ibuprofen." Tr. 14, 540-42. Two years later, on January 15, 2019, Plaintiff admitted that he continued to take a bottle of Tylenol per week and unilaterally stopped taking his prescription medication despite reporting it provided relief without side effects. *Id.*

Even if this Court were to find the ALJ erred in determining his headaches to be non-severe, such error is harmless if the ALJ finds Plaintiff to suffer from another severe impairment,

11

continues the evaluation process, and considers the effects of the non-severe impairment at the other steps of the process. *See Coleman v. Astrue*, No. 4:11-CV-2131-CDP, 2013 WL 665084, at *10 (E.D. Mo. Feb. 23, 2013). Here, any potential error in not finding Plaintiff's headaches severe at Step Two would be harmless. The ALJ found Plaintiff had the severe impairment of right-sided acoustic neuroma, status post external beam radiation, with right-sided hearing loss. Tr. 13. When considering Plaintiff's RFC, the ALJ discussed the effects of his headaches in combination with all of his other impairments, severe and non-severe. *See* Tr. 15-17. Thus, the Court cannot find the ALJ committed reversible error in his determination that Plaintiff's headaches were not a severe impairment.

### B. The ALJ's Credibility Findings

Plaintiff also argues this matter should be remanded because the ALJ did not properly evaluate his subjective complaints as to his hearing and balance issues. Specifically, Plaintiff argues:

> The fact that his right acoustic schwannoma is stable (not changing) does not discredit [P]laintiff's testimony about the symptoms or their effects on his ability to function. The evidence of record also contradicts the ALJ's statement as there is evidence of both improvements and decline in his symptoms during the relevant time period.

ECF No. 25, at 6. Plaintiff points to treatment records in which he complained of tinnitus, hearing loss, ear pain, headaches, dizziness, and paresthesia. Plaintiff argues these treatment notes do not support the ALJ's finding that his symptoms were stable. Plaintiff further takes issue with the ALJ's conclusion that his symptoms of dizziness were not supported by the record, and cites to various treatment notes in which he reported dizziness, vertigo, and unbalanced gate.

When evaluating subjective complaints, the ALJ "must consider objective medical evidence, the claimant's work history, and other evidence relating to (1) the claimant's daily

activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) the claimant's functional restrictions." *Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019) (citations omitted); *see also* 20 C.F.R. § 416.929(c)(3). An "ALJ may decline to credit a claimant's subjective complaints 'if the evidence as a whole is inconsistent with the claimant's testimony.'" *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (citation omitted).

The ALJ acknowledged Plaintiff's subjective reports of headaches, dizziness, and hearing loss. Tr. 15, 313. Within the Function Report, Plaintiff stated he could walk approximately 100 feet before needing to "stop, catch [him]self and sit down." *Id.* Plaintiff asserted he had "terrible" hearing and balance," and "severe ringing of the ears." *Id.* Plaintiff reported he needed to sit down to dress and had to take baths instead of showers. Tr. 15, 314. He also described difficulties with squatting, bending, standing, walking, kneeling, hearing, stair climbing, completing tasks, concentration, and understanding. Tr. 15, 318. Plaintiff reported, however, that he was able to prepare his own meals, perform basic household chores, shop for groceries, and manage his own finances. Tr. 15, 315-17. Plaintiff did not drive because his license was revoked in 2008 due to a driving under the influence charge, and not due to a physical impairment. Tr. 316, 322. Plaintiff stated he could get his license, but he "d[idn]'t feel like it." Tr. 316. The ALJ determined that "[a]s for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the records show the claimant's condition was stable with no evidence of progression." Tr. 15.

The ALJ then summarized the medical record related to his hearing and balance issues. On January 14, 2013, Plaintiff appeared to Dr. Justin W. Roberts, an Ear, Nose, and Throat specialist, with complaints of worsening hearing loss and ringing in his ears. Tr. 15, 422-25. On

February 12, 2013, Plaintiff appeared for an MRI of the brain, which revealed findings "consistent with vestibular cochlear acoustic schwannoma," causing sensorineural hearing loss. Tr. 15, 427, 469. He was referred to a neuro-otologist for pro bono care treatment. Tr. 15, 427. On March 13, 2013, Plaintiff appeared to Dr. James E. Benecke, Jr. for a neurological examination in which he tested positive for poor hearing. Tr. 15, 437-44. Dr. Benecke recommended radiation for the right acoustic neuroma due to his young age and the size of the lesion. Tr. 15, 442.

On March 18, 2013, Plaintiff explained to his oncologist, Dr. Joe, that "he is able to hear out of his right side, but he needs to turn up the volume on his television to hear. Otherwise, voices sound muddled on the right side if he plugs his left ear." Tr. 15, 476. Upon physical examination, Dr. Joe indicated Plaintiff was able to hear when he spoke in a normal voice, but had difficulty hearing when he whispered. Tr. 15, 477. Dr. Joe also recommended some type of radiotherapy for treatment. *Id.*

By May 28, 2013, Plaintiff completed a course of fractionated radiotherapy. Tr. 15-16, 479. Dr. Joe indicated Plaintiff "tolerated his treatment course extremely well," and "[b]y the end of the treatment, the pain in the ear and tinnitus had markedly improved." *Id.* Dr. Joe recommended waiting two to three months before obtaining a repeat MRI because "these tumors tend to regress very slowly." *Id.*

At his follow up appointment on July 12, 2013, Plaintiff reported decreased tinnitus, denied significant pain in his right ear, and felt as if his hearing was slowly improving. Tr. 16, 481. Upon physical examination, Dr. Joe wrote: "He was able to hear me whisper serial numbers in the right ear as well as he heard on the left side. This is markedly improved compared to initial

consultation on 03/18/2013." Tr. 481. Dr. Joe described Plaintiff as "fairly asymptomatic" and recommended he not obtain a repeat MRI for four to five months. *Id.*

Plaintiff appeared for a follow up appointment with Dr. Joe on December 12, 2013, in which he complained of "worsening ringing in the ear." Tr. 16, 483-84. Plaintiff described the ringing as intermittent, occurring about four times per week. Tr. 483. He also reported his hearing had not improved, but did not worsen either. *Id.* Plaintiff denied significant headaches and nausea, but indicated persistent fatigue. *Id.* An MRI revealed "no interval change in the size of the cerebellar pontine angle lesion with intracanalicular extension of the right side." *Id.* The MRI was without contrast because of Plaintiff's allergy to gadolinium. *Id.*

Plaintiff appeared for a follow up appointment with Dr. Joe on March 13, 2014, and reported "some episodic tinnitus in the right ear that happens 3-4 times a week" and "some difficulty with his balance at times, but he [did] feel it [was] improved compared to what it was prior to treatment." Tr. 16, 485. Upon physical examination, Plaintiff was in no acute distress; however, he had "some difficulty with the right ear with acuity of his hearing when [Dr. Joe] tried to whisper a set of [three] numbers." *Id.* He had no difficulties in hearing with his left ear. *Id.* A repeat MRI described his tumor to be "stable." Dr. Joe recommended a follow up in one year. Tr. 486.

The ALJ noted Plaintiff continued to appear for yearly examinations to monitor his right-sided schwannoma. The MRI results consistently revealed his acoustical schwannoma to be unchanged. Tr. 16, 452 ("unchanged in size and appearance"), Tr. 540 ("repeat bMRI revealed stable R schwannoma"), Tr. 549 ("stable" and "unchanged" mass), Tr. 553 ("unchanged in size and appearance" with "no new abnormalities"), Tr. 561 ("no change right acoustic schwannoma"), Tr. 572 (stable with no significant change in size and no new lesions), Tr. 582

("no significant interval change in the appearance of the known right acoustic schwannoma"). Despite Plaintiff's argument, these records substantially support the ALJ's determination that his right acoustic schwannoma was stable.

Although Plaintiff expressed complaints of intermittent episodes of tinnitus and headaches throughout his treatment, progress notes from March 12, 2015, March 10, 2016, March 9, 2017, and April 12, 2018, indicate he was doing generally well "without evidence of disease progression" or abnormal physical findings. Tr. 16, 487, 496, 498, 572, 606. During a September 22, 2018 consultative examination, Plaintiff was described to have the ability to "hear normal conversational speech." Tr. 16, 533. The ALJ noted "his acoustic neuroma had not required emergency room[] visits or hospitalizations." Tr. 17.

The ALJ cited to Plaintiff's testimony that he had dizzy spells ten times per day every time he stood up, and compared it to Dr. Joe's May 24, 2019 treatment notes, in which Plaintiff reported only "occasional" issues with dizziness which he attributed to moments where he would stand up too quickly. Tr. 16 (comparing Tr. 79 to Tr. 605). The ALJ also found Plaintiff's testimony regarding the severity of his fatigue and dizziness was contradicted by his assertions to Dr. Joe, in which he said he was taking care of his elderly parents who "count on him for a fair bit of assistance." Tr. 16, 494. Plaintiff's self-described role as a partial caretaker to his parents contradicted his Function Report, in which he stated he did not care for others. (Compare Tr. 314 with Tr. 494). The ALJ also considered that although Plaintiff complained of having an unbalanced gait to a consultative examiner, he was observed to have a "steady symmetric gait with no assistive device." Tr. 534. Additionally, the September 19, 2017 and January 15, 2019 treatment notes indicated his symptoms were "never" associated with gait instability, and his gait was "normal" upon examination. Tr. 540, 608, 610, 659. The ALJ also noted he never reported

16

to a treating physician that "while walking he would get dizzy and need to stop and grab hold of something or sit down." Tr. 16.

As to his claims regarding fatigue, the ALJ found the record did not reflect it to be a debilitating symptom. Tr. 16. For example, Plaintiff denied fatigue to his treating providers on January 1, 2013 and March 13, 2013, Tr. 422, 438, 587. Dr. Joe did not identify fatigue as an impairment secondary to acoustic neuroma in his RFC Questionnaire. Tr. 597. On January 15, 2019, Plaintiff indicated he did not have any side-effects, including fatigue. Tr. 641, 658. The Court does note that in March of 2013, Plaintiff did complain of "persistent fatigue" to Dr. Joe. Tr. 483.

Plaintiff primarily supports his request for remand by citing to records indicating a different conclusion could have been reached as to his RFC limitations resulting from his hearing and balance issues. This evidence is not, however, so overwhelming as to negate the substantial, contrary evidence upon which the ALJ relied in forming her decision. Moreover, it is not the province of this court to re-weigh the evidence as it existed before the ALJ. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (as long as there is substantial evidence in the record, the ALJ's decision will be upheld even if substantial evidence exists adverse to the ALJ's findings); *see also Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017) (RFC was appropriate, despite the plaintiff's ability to point to contrary evidence in the record, where "good reasons and substantial evidence on the record as a whole" supported the ALJ's conclusions).

In this case, substantial evidence within the medical record as a whole, summarized above, supports the ALJ's RFC determination. The ALJ thoroughly considered the objective medical evidence, including MRI results and physical examinations, conservative treatment with

medication, the ability to maintain many daily activities of living, and no evidence of emergency room visits or hospitalizations. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (citing *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992)).

### C. Treating Physician's Opinion

Lastly, Plaintiff argues the ALJ erred by not attributing more weight to the RFC opinion of his treating physician, Dr. Joe. On May 24, 2019, Dr. Joe completed a three-page checklist RFC Questionnaire to support Plaintiff's application for benefits. Tr. 597-99.

Dr. Joe identified Plaintiff's diagnoses as right acoustic neuroma and indicated Plaintiff experienced headaches approximately three times per week, which prevented him from being able to concentrate. Tr. 597. Dr. Joe did not indicate his headaches caused vertigo, nausea or vomiting, malaise, photosensitivity, visual disturbances, mood changes, or mental confusion. *Id.* Dr. Joe wrote it was "unknown" what triggered an onset of Plaintiff's headaches or what made them worse. Tr. 598. Dr. Joe opined Plaintiff would be generally precluded from performing basic work activities and would need a break from work when experiencing a headache. *Id.* Dr. Joe further indicated Plaintiff could walk two city blocks before needing to rest, and he could continuously sit for only 45 minutes and stand for 30 minutes. *Id.* Dr. Joe opined Plaintiff could sit and stand/walk for less than two hours in an eight-hour workday, would likely be absent from work more than four days per month, and would need an unscheduled break once per day. Tr. 598-99.

The ALJ considered Dr. Joe's RFC Questionnaire and attributed it little weight. In making this determination, the ALJ explained:

> First, there is no explanation as to why his walking, standing or sitting would be limited. If these restrictions are to be attributed to the claimant's headaches, the record does not support that. As noted above, the claimant alleged ongoing headaches, but his diagnosis is tension headaches, triggered by his excessive over the counter medication use. Additionally, although he saw a neurologist in September 2017, and received medication, he did not return for treatment until 2019.

Tr. 17.

For claims filed before March 27, 2017, the regulations provide that if "a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, [the Social Security Administration] will give it controlling weight." 20 C.F.R. § 404.1527. The regulations further provide the ALJ must "give good reasons" when assigning weight to a treating source's medical opinion. *Id.* However, the ultimate determination of disability rests with the Commissioner and not the treating physician. The Commissioner is not bound by a treating physician's opinion where there is substantial evidence in the administrative record to the contrary. The opinion of a treating physician is only accorded great weight when it is supported by sufficient clinical data and is consistent with the objective medical evidence. *See Warner v. Comm'r of Social Sec.,* 375 F.3d 387, 390 (6th Cir. 2004).

Plaintiff takes issue with the ALJ's determination that Dr. Joe's opinion should be attributed less weight because the record did not support walking, standing, and sitting limitations. Plaintiff points to Dr. Joe's treatment notes from the same day he completed the RFC Questionnaire, which indicated Plaintiff "has some chronic issues with back pain as well which limit his ability to stand or sit for extended periods of times." Tr. 605.

In the Court's review of the record, the ALJ did not err in attributing less weight to Dr. Joe's opinion because the treatment notes as a whole do not support the physical limitations identified in his RFC assessment. On March 13, 2013, Plaintiff was negative for musculoskeletal weakness with no kyphosis or scoliosis detected during a physical exam of his back and spine. Tr. 438. Only one treatment note, dated January 15, 2019, documents a complaint of "severe back pain without shooting pain." Tr. 658. However, this note also indicates he was "not taking anything for his back." *Id*. During Plaintiff's consultative examination with Dr. Irlam, Plaintiff was observed to have a steady symmetric gait with no assistive device, was able to squat and rise, and could get up from a seated position with no reported difficulties. Tr. 534. On September 19, 2017 and January 15, 2019, treatment notes indicated his symptoms were "never" associated with gait instability, and his gait was "normal" upon examination. Tr. 540, 608, 610, 659. Significantly, none of his treating providers indicated any walking, standing or sitting limitations related to his chronic back pain, other than Dr. Joe's isolated notation on the day he completed his RFC assessment questionnaire. *See* Tr. 557, 631, 638, 650. Moreover, the record is completely devoid of any radiological exams or treatments for his chronic back pain. Thus, substantial evidence supports the ALJ's evaluation of Dr. Joe's physical limitation opinion.

Plaintiff also takes issue with the ALJ's decision to attribute little weight to Dr. Joe's RFC assessment because he wrote that Plaintiff's tension headaches were "triggered" by excessive over-the-counter medication use. Plaintiff argues his headaches were not "triggered" by his overuse of Advil or Tylenol, but instead his treatment was "complicated" by such behavior. While the Court agrees with Plaintiff that the ALJ's word choice was inept, the record reveals Plaintiff was directed to limit his ingestion of over-the-counter medication because it negatively affected his headache treatment. On September 18, 2017, Dr. Lopate opined his

headaches were "likely tension type" which were "further complicated by medication overuse." Tr. 542. On January 15, 2019, Plaintiff continued to ingest up to a bottle of Tylenol per week and was once again advised that his headaches were "further complicated by medication overuse." Tr. 641-642, 648. On May 24, 2019, a treatment note again indicated Plaintiff's failure to comply with reducing his over-the-counter medication usage. Tr. 648.

It is well established in the Eighth Circuit that a failure to follow prescribed medical treatment can be considered in determining whether to give a treating physician's opinion controlling weight. *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (finding the plaintiff's symptoms were precipitated by a failure to comply with prescribed treatment) (quoting *Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008)). "Employing the same reasoning, a failure to follow treatment recommendations may also be considered in weighing a treating physician's opinion evidence." *Biglari v. Saul*, Case No. 4:19-CV-03116-SPM, 2021 WL 794527, at *5 (E.D. Mo. Mar. 2, 2021) (citing *Bernard v. Colvin*, 774 F.3d 482, 487 (8th Cir. 2014)).

Here, substantial evidence supports the ALJ's determination that his headaches were exacerbated by Plaintiff's non-compliance in reducing his over-the-counter medications, and his symptoms would have been better monitored and treated if he complied with his provider's directives. *Biglari,* 2021 WL 794527, at *6 ("It was not outside the zone of choices available to the ALJ to construe Plaintiff's failure to comply with recommended and prescribed treatments as evidence that is inconsistent with [the treating physician's] opinions regarding Plaintiff's functional limitations.").

Plaintiff's argument is based on a harmless error in the ALJ's word choice of "triggered," when he more aptly should have used the word "exacerbated" or complicated." Despite this deficiency in opinion writing, the ALJ did not err in considering Plaintiff's over-the-counter

medication use in defiance of his treating physician's directives. *See Kamann v. Colvin*, 721 F.3d 945, 951 (8th Cir. 2013*) (an argument based on semantics does not justify reversal when the ALJ's decision is supported by substantial evidence).

Lastly, Plaintiff argues the ALJ should not have discounted Dr. Joe's opinion due to gaps in treatment because it was due to a loss of insurance. The Court cannot find reversible error based on this argument. While the record reflects a gap in headache treatment for the entire year of 2018, Dr. Joe indicated Plaintiff did not need insurance to be seen in a clinic. Tr. 641. Most significantly, the record is devoid of any attempt by Plaintiff to contact the clinic to discuss his lack of insurance or seek advice for low-cost treatment. *See Osborne v. Barnhart*, 316 F.3d 809, 812 (8th Cir. 2003) (plaintiff is not excused for failure to pursue treatment where there is no evidence plaintiff was ever denied treatment because of insufficient funds or insurance); *Hadley v. Astrue*, 2009 WL 1634907, at *10 (W.D. Ark. June 10, 2009) ("the ALJ did not err in criticizing Plaintiff for failing to seek physical therapy, even if that therapy was not covered by Medicaid"). Notably, Plaintiff's Ear, Nose, and Throat doctor previously advised him that he had "pro bono care" options. Tr. 427.

Even though Plaintiff stopped seeking headache treatment in 2018 due to insurance issues, he did appear for doctor visits related to his right acoustic schwannoma. Tr. 555-66, 572-73. *See Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (while financial difficulty can constitute a good reason for lack of medical treatment, an ALJ can properly find inconsistencies when the evidence shows a plaintiff sought and received other medical treatment despite a supposed inability to pay). Also, prior to his insurance issues, he still had gaps in treatment. For example, on March 10, 2016, Plaintiff reported worsening headaches, and Dr. Joe directed him to follow up in one year. Tr. 14, 494. Plaintiff did not seek additional treatment until more than

22

eighteen months later on September 18, 2017. Tr. 14, 540-42. Thus, the ALJ properly considered Plaintiff's sporadic headache treatment in weighing Dr. Joe's RFC assessment.

For the aforementioned reasons, the Court finds Plaintiff's arguments to be without merit as the ALJ's decision is based on substantial evidence in the record as a whole and is consistent with the Social Security Administration Regulations and case law.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff Bradley Gray's Complaint is **DISMISSED, with prejudice**. A separate judgment will accompany this Memorandum and Order.

**IT IS FURTHER ORDERED** that the Clerk of Court shall substitute Kilolo Kijakazi for Andrew M. Saul in the court record of this case.

So Ordered this 12th day of November, 2021.


*/s/ Stephen R. Welby*
STEPHEN R. WELBY
UNITED STATES MAGISTRATE JUDGE